# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs April 18, 2012

## STATE OF TENNESSEE v. ANTONIO JAMARC WARFIELD

**Appeal from the Circuit Court for Maury County**
**No. 19409       Robert L. Jones, Judge**

---

**No. M2011-01235-CCA-R3-CD - Filed October 5, 2012**

---

A Maury County jury convicted appellant, Antonio Jamarc Warfield, of especially aggravated robbery, a Class A felony, and especially aggravated burglary, a Class B felony. The trial court sentenced him to serve an effective sentence of twenty-one years in the Tennessee Department of Correction. On appeal, appellant argues that the evidence was insufficient to support his convictions. After reviewing the record, the parties' briefs, and applicable law, we affirm the conviction of especially aggravated robbery, modify the conviction of especially aggravated burglary to aggravated burglary, and remand for entry of a judgment on the aggravated burglary conviction consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed as Modified and Remanded.**

ROGER A. PAGE, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Ronald G. Freemon, Columbia, Tennessee, for the appellant, Antonio Jamarc Warfield.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Mike Bottoms, District Attorney General; and Daniel J. Runde, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts

A Maury County grand jury indicted appellant for attempted first degree murder, especially aggravated burglary, and especially aggravated robbery. The Maury County

Circuit Court held a jury trial January 24-26, 2011, at which the parties presented the following evidence:

Officer Keith Falls of the Columbia Police Department testified that he was the first officer to arrive at the scene of this incident. He waited until the next officer, Officer Stoker, arrived at the scene before going inside the residence. Officer Falls said he waited for Officer Stoker because of "the nature of the call" and what he observed as he approached the residence. As he entered the residence, Officer Falls noticed that the door was ajar and saw a spent shotgun casing in the doorway. He also heard footsteps coming from inside the residence. Officer Falls eventually collected the shotgun shell and placed it in an evidence bag.

Officers Falls and Stoker entered the residence and conducted a protective sweep, looking for suspects and victims. Officer Falls did not see anyone as he walked through the residence. The door to the first bedroom was closed, but the officers heard noise come from inside that bedroom. They opened the door and saw the victim on the bed with "red liquid" on his face. He was leaning over and holding his hands to his face. The officers attempted to speak with him, but he was unable to respond. Officer Falls said the victim arose, walked out of the room and into the hallway, where he sat down. Using the diagram, Officer Falls testified that the victim sat where the diagram indicated a pool of blood in the hallway.

Officer Falls testified that he thought the victim had been shot with a shotgun based on the shell casing he saw and the victim's injuries. He said the victim had "quite a traumatic opening around the right jaw and a bunch of red dot wounds." Officer Falls looked inside the bathroom of the residence and saw it was "covered with [a] red liquid substance." He also observed what he believed to be shotgun holes in the wall above the shower. He collected three shotgun pellets from the holes and logged them as evidence. Officer Falls did not find pellets in any other room in the home. After he collected the pellets, Officer Falls swabbed the red substance and put the swabs in an evidence box. Officer Falls stated that emergency medical services ("EMS") arrived and transported the victim to the hospital approximately five minutes after he and Officer Stoker discovered the victim.

On cross-examination, Officer Falls testified that the evidence the State entered through him was already marked because he testified at another defendant's trial for this shooting. He stated that he did not request a fingerprint analysis of the shell casing. He further stated that he did not attempt to find any fingerprints in the residence. To his knowledge, law enforcement never found the shotgun. Officer Falls did not know how many weapons the perpetrators used in this shooting and said he did not find any evidence to indicate that the perpetrators used any other weapon besides a shotgun.

Officer Bryon Stoker with the Columbia Police Department testified that he was working during the early morning hours of September 29, 2009, when a dispatch officer directed him to go to 1117A Comstock Street. He arrived at the scene around 2:30 a.m. Officer Falls was already at the scene when Officer Stoker arrived, and Officer Paul McCormick arrived shortly after Officer Stoker. Officer Stoker observed a spent shotgun casing next to the door. Officer Stoker identified a photograph he took of the spent casing.

Officer Stoker said the officers searched the residence to ensure that no one else was inside. He stated that as they "entered the residence, [they] cleared the living room and . . . noticed in the hallway there was an enormous amount of blood." The officers went farther into the residence and heard noises coming from the first bedroom. The door was closed, and the officers opened the door so they could secure the room. When they opened the door, they saw the victim, who was bleeding, on the bed. The victim then arose and walked out of the bedroom and into the hallway. When he reached the hallway, he "went to the ground." EMS arrived and transported the victim to the hospital. Using a diagram of the home, Officer Stoker identified where the victim was lying in the hallway and where the victim's blood had pooled in the hallway. He further identified and described photographs he had taken of the crime scene.

On cross-examination, Officer Stoker testified that he was the only police officer who photographed the crime scene. He stated he photographed the bathroom door "[b]ecause of the damage to the door." He said at the time he took the photograph, he did not have any reason to believe the damage to the door had anything to do with the incident. One photograph depicted shotgun pellets lodged in the bathroom wall. Officer Stoker estimated the pellets were "pretty high" because they were "a little bit over his head." However, he said he could not tell whether the victim was standing or lying down when the shotgun blast occurred. Officer Stoker stated that the lower portion of the bathtub "[p]robably" did not have any shotgun damage. The officers searched the home for further evidence of a shotgun blast but did not find any.

On redirect examination, Officer Stoker testified that "something red" was in the tub. To his knowledge, the officers did not recover the shotgun used in this incident. On recross-examination, Officer Stoker testified that he did not know how many guns were involved in this incident or what other types of weapons the perpetrators may have used. He said the bathroom contained evidence of at least one shotgun blast, and he did not discover evidence of a shotgun blast in any other room.

Officer Paul McCormick of the Columbia Police Department testified he was working the "midnight shift patrol" on September 29, 2009, when a dispatch officer requested that he back up Officers Keith Falls and Bryon Stoker at 1117A Comstock Street. Officer

McCormick said he had an officer in training with him, and they arrived at the scene around 2:30 a.m. As Officer McCormick entered the residence, he observed a shotgun shell casing lying near the front door. As he went farther into the home, he observed the victim, Thomas Edward Jones, in the hallway, appearing to have been shot in the face. Officer McCormick attempted to talk with the victim, but he could not discern what the victim was saying.

Officer McCormick further testified that he assisted in supervising and securing the crime scene and that he drew a diagram of the crime scene. He identified the diagram he drew, which depicted the layout of the residence. Officer McCormick marked several areas on the diagram where officers found a substance that appeared to be blood. He also noted on the diagram that officers found teeth in the first bedroom. The officers also found shotgun pellets in the upper corner of the shower in the bathroom.

On cross-examination, Officer McCormick testified that as he entered the residence and turned into the hallway, the victim exited the first bedroom and lay in the hallway. He said the victim attempted to rise several times but was unsuccessful. Officer McCormick stated he did not see the victim go into the bathroom while he was there.

Officer McCormick further testified that the pellets the officers found in the shower were at the "average height of a shower." He could not say whether they would have gone above the victim's head. He explained that the pellets came from a shotgun and "were spread." Officer McCormick did not find any evidence of a shotgun "blast" in the bedroom. The diagram of the crime scene showed areas Officer McCormick called "blood pools." Although he had not yet tested the substance, Officer McCormick labeled the areas as "blood pools" because, based on his experience, that is what he believed them to be. Officer McCormick witnessed the victim bleeding in the hallway causing a pool of blood. He did not know in which room the victim had been shot but stated that most of the blood was between the bathroom and bedroom.

Amanda Thompson identified the appellant and testified that she had known him for approximately one year. She said his nickname was "K-Sneaky." She had also known David Buckhanon, who was also charged and tried separately for this incident, for about a year and his nickname was "Lay-lo." Thompson testified that at the time of the incident, she had known the victim, whom she called "Peanut," for more than a year. She stated that she used to date the victim's former roommate. According to Thompson, in September 2009, the victim was living on Comstock Street with Chastity Price and Sarah Williams. She said the victim was dating Price. Thompson said she, Buckhanon, and Christopher Davis visited the victim's home "when it first got dark outside" on September 28th. She said the victim was "[s]itting on the couch smoking meth" and drinking "[s]ome kind of liquor with a red lid" when they arrived. She later testified that the victim finished smoking his methamphetamine

shortly after she arrived at his house. According to Thompson, the victim "finished floating the boat that he had, he crumbled it up, he threw it way, he rolled a blunt[,] and he gave [her] a Xanax." The group stayed at the victim's home for approximately thirty minutes, "[l]ong enough for an argument to occur and [for her to] say, if y'all are riding with me, get in this car, let's go." She said the argument was between the victim and Davis.

Thompson stated she, Davis, and Buckhanon left the victim's home and went to the Woodland Trailer Park. Thompson stayed there "for a second" before leaving to go to a friend's home. When she returned to the Woodland Trailer Park, she spoke with appellant and Buckhanon. Thompson and appellant discussed appellant's borrowing her vehicle, and she ultimately allowed appellant and Buckhanon to borrow her vehicle. Appellant did not tell Thompson where he was going with her vehicle. She said she did not actually see who drove her vehicle because she left it parked in the driveway with the keys in the ignition and walked to a friend's home on the next street. Although she did not see them leave, someone told Thompson that appellant and Buckhanon left the trailer park together. After Thompson left her friend's home, she found her car parked in Davis's driveway. She did not know who returned her vehicle. Thompson testified that she did not have any weapons in her car when she allowed appellant to borrow it and did not see any weapons in it when she recovered it from Davis's driveway.

On cross-examination, Thompson testified that she and Buckhanon had drunk alcohol and "smoked weed" before and after they went to visit the victim. She stated that Buckhanon was not involved in the argument between the victim and Davis until Buckhanon tried to tell Davis to leave the victim's home. Thompson said when Buckhanon got involved, the victim called him a "crab." She explained that "crab" was "a disrespect[ful] word to . . . Crips." Thompson stated that, as far as she knew, Buckhanon was not affiliated with any gang and did not get mad when the victim called him a crab.

During the argument between the victim and Davis, Thompson told Buckhanon and Davis that it was time to leave, and they all went outside. According to Thompson, the victim went outside as well and began digging in the bushes. Thompson thought the victim was upset with Davis and was going to get a gun, so she, Buckhanon, and Davis left. They did not discuss the victim's digging in the bushes after they left. She stated that the only subject they discussed in the car was Price's getting the victim's name tattooed on herself and Davis's smacking her in the face for doing so.

Thompson later testified she did not see a gun by the bushes and agreed that the victim could have gone to the bushes for many reasons. She stated she had never before seen the victim hide a gun or any other type of weapon around the bushes. She further said she knew

-5-

"it was a good idea to leave" when the victim was digging in the bushes because she had seen the victim with a gun on several prior occasions.

Thompson testified that appellant did not seem angry when he asked to borrow her vehicle because "he wasn't there for the argument to be mad over anything." She did not ask appellant where he was going with her vehicle because they "had a little fling going on, [and] if he wanted to use [her] vehicle, he could use it." She also had a "fling" with Buckhanon sometime before the incident. Thompson said she would usually see Buckhanon whenever he was in Columbia, Tennessee, but after the incident, she did not see him anymore. However, Thompson had his telephone number and could contact him if needed. Thompson spoke with appellant the day after the shooting and said he did not mention anything about the previous night and did not appear to be nervous.

Sarah Williams testified that at the time of the incident, she had known Buckhanon for approximately four to six years. She also knew appellant, whom she called "K-Sneaky," and identified him in the courtroom. On September 29, 2009, Williams lived at 1117 Comstock Street, Apartment A, with the victim and Price. The victim and Price slept in "[b]edroom 2, the small bedroom[,]" together and Williams slept in "bedroom 1." She identified photographs of her apartment. Williams viewed the diagram of the apartment, which showed her couch in the middle of the living room, and said it was incorrect because the couch was against the wall on September 29th. She also viewed the photograph of her bathtub taken by Officer Stoker. She stated that when she left her home on September 29th, her bathtub had a shower curtain hanging on a shower rod, but in the picture it did not.

Williams stated that she was "in and out" of the apartment all day on September 28, 2009. She remembered that many people were at her home that day. However, she could not specifically remember the exact individuals who were there. She said Buckhanon frequently came to her apartment, but appellant had only been there once. Williams and Price left the apartment between 9:30 and 10:00 p.m. Williams said Tiffany Barnett, Jessica Dexter, and Thomas Edward Jones were at the apartment when she left.

Williams testified that she returned to her apartment after 12:00 a.m. She went inside the apartment before Price, who was retrieving something from the backseat of a vehicle. When Williams entered the living room the lights were off, but the television provided a little light. She noticed a bottle tipped over by a chair in front of the television where the victim usually sat. She said she saw something red on the floor and assumed the victim had vomited because he had started drinking a new type of alcohol that came in different colors. She stated that "[i]t never came to [her] mind that it was blood[.]" Williams yelled, "Bra, are you okay?," to the victim, but he did not answer. She went into the hallway and saw "someone laying [sic] in [her] bathtub with half their face missing." Williams did not immediately

recognize the victim because she could not see his face and "because of the incidents that had occurred earlier in the day." When she saw him in the bathtub, she thought the victim was dead. She told Price to get back inside the car, and they left to call 9-1-1. The 9-1-1 dispatcher advised Williams to remain where she was and not return to the scene. According to Williams, before the shooting, the victim could see and did not have any vision problems.

On cross-examination, Williams testified that everyone was high before she left her apartment. They had been "smoking meth and crack, snorting cocaine, taking Xanaxes, [and] smoking weed." She described the victim as "just as high as a bird could be" but later said she could not remember his condition because she was "so messed up." Williams was asleep in her bedroom when the argument between the victim and Davis about Price's having the victim's name tattooed on her wrist occurred; however, she said she was aware of the argument. According to Williams, Davis "thought that [the victim] had [her and Price] smoking meth, when in reality, [they] were the ones that got [the victim] smoking meth." She said Price was in her own room with a couple of people during the argument. Price yelled for Williams and told her that Davis had hit her. Williams and the victim went into Price's room. Williams stated that she then left Price's room and let the victim handle the situation. She further stated the victim handled it by telling everyone "to get the hell out of the house." Williams recalled that Buckhanon was at her apartment the day Davis hit Price, but she did not know whether that was the day of the incident. Williams also recalled that on the day the victim was shot, the victim was involved in a "[v]ery heated" argument over the telephone. She stated that each person was "on speakers screaming at each other."

Detective Joey Gideon with the Columbia Police Department testified that he investigated the shooting in this case. At approximately 3:15 a.m. on September 29, 2009, his patrol officer contacted him and advised him of the incident. Upon his arrival at the scene, Detective Gideon spoke with the police officers who were already there. Officer Falls briefed him and walked him through the scene.

Detective Gideon stated that when he entered the residence, he saw "a red liquid substance on the floor around the bathroom." He also saw a red substance on the floor of the first bedroom. Detective Gideon did not recall seeing teeth in the bedroom. EMS had already transported the victim to the Vanderbilt University Medical Center when Detective Gideon arrived. After the walk through, police officers informed Detective Gideon that they were holding Williams and Price in separate locations. Detective Gideon had them transported to his office for an interview.

Detective Gideon recalled that Detective Orlando Cox, who assisted him with the investigation, interviewed the victim in early October 2009. Based on Detective Cox's interview with the victim, Detective Gideon focused his investigation on appellant and

Buckhanon. Detective Gideon identified a photograph of appellant and stated that it accurately depicted appellant.

On October 7, 2009, officers "pick[ed] up" appellant for questioning. Detective Gideon advised appellant of his *Miranda* rights before interviewing him. Appellant assured Detective Gideon that he understood his rights and waived them. Appellant did not initially admit any involvement in the shooting. Appellant eventually gave a statement denying any involvement in the crime. Detective Gideon testified that appellant remained in police custody after he gave his statement. While appellant was in custody, authorities continued to discuss the incident with him. Appellant eventually gave an oral statement to Detective Cox.

Detective Gideon recalled that the victim alleged that appellant and Buckhanon took money and marijuana from the victim's home. He said the officers never recovered these items. He also said officers never recovered the weapon used in the shooting.

On cross-examination, Detective Gideon testified that based on his investigation, he believed the motive for the shooting was robbery. He stated that in addition to appellant and Buckhanon, he suspected Thompson of being involved in the crime after speaking with appellant. Detective Gideon attempted to interview Thompson several times but could not obtain an interview with her. Detective Gideon stated that appellant did not initially admit his involvement. Detective Gideon also interviewed Buckhanon.

Detective Gideon testified that he went to the scene to "take a look around." When he arrived at the scene, the red substance was no longer on the floor. However, he saw evidence of a shotgun blast in the bathroom. Detective Cox believed the blast area was "midway up the wall." He did not see any evidence of a shotgun blast in the bedroom or recover any shotgun pellets from the bedroom.

Columbia Police Department Detective Orlando Cox testified that he assisted in the investigation of this case. As part of his investigation, he spoke with Price and Williams. He also spoke with the victim on October 7, 2009. Detective Cox said the victim was in serious condition. The victim advised Detective Cox that he was blind and had a tracheotomy. Based on his discussion with the victim, Detective Cox developed appellant and Buckhanon as suspects.

Detective Cox spoke with appellant at the police station in the detective's interview room. Detective Cox did not recall whether he was in the room when the other detective gave appellant his *Miranda* warnings and did not ask whether appellant had received the warnings because he saw the "*Miranda* rights warning" on the table. Detective Cox said he

left the interview room during the interview process. His lieutenant later advised him that appellant wanted to speak with him. Detective Cox returned to the interview room and spoke with appellant. When he spoke with appellant, Detective Cox knew that Buckhanon was also potentially involved. Detective Cox testified that appellant orally made his statement while he noted what appellant said.

Appellant told Detective Cox that he was looking for a "quick lick," which meant a robbery. Detective Cox stated that appellant told him he knew the victim had money and drugs, so he and "an unknown black male" devised a plan to rob the victim. Detective Cox testified that appellant said he and the "unknown black male" "went up to about a block away from the victim's house on Comstock near College Hill School, then . . . [appellant and the 'unknown black male'] got out." Detective Cox asked appellant what kind of weapon they used and appellant told him it was a shotgun with a long barrel. Appellant said the shotgun was in the vehicle when he got into it. When appellant and the "unknown black male" exited the vehicle, appellant had possession of the shotgun. Appellant told Detective Cox that he and the "unknown black male" "walked up behind the house [and] heard the victim talking on the porch. [T]hey walked to the front, [and] told [the victim] to . . . drop it." The victim dropped money and drugs, and appellant laid the shotgun down to collect the money and drugs. Appellant said the "unknown black male" picked up the shotgun, and appellant told him it was time to go. Detective Cox stated appellant told him that the "unknown black male" "forced [the victim] into the house. [The victim] ran into the bathroom and [the 'unknown black male'] followed him to the bathroom. . . . [the 'unknown black male'] used the shotgun to hit it against the door and kick the door in." Appellant told Detective Cox the "unknown black male" made the victim get into the bathtub and then shot him. Appellant further told Detective Cox that he asked the "unknown black male" why he shot the victim, panicked, and ran to the car. Appellant and the "unknown black male" drove to the Woodland Trailer Park and appellant exited the vehicle. Appellant told Detective Cox that he received $55 from the robbery, and the "unknown black male" received $45. He further told Detective Cox that he smoked the marijuana and sold the Xanax he stole from the victim.

On October 9, 2009, Detective Cox requested that appellant return to his office for further questioning about the identity of the "unknown black male." Appellant told Detective Cox the same version of events that he gave during the first interview. Detective Cox testified that he could "just tell that there was something weighing on [appellant's] soul" and asked him to tell the truth. Appellant advised Detective Cox that appellant's cousin, Demontrae Smith, could get him to tell the truth. Detective Cox called and spoke with Smith on the telephone. Appellant spoke with Smith and a woman whom appellant identified as his aunt. As a result of that conversation, appellant told Detective Cox that Buckhanon was the "unknown black male" who shot the victim. Appellant also told Detective Cox that he

"jumped in the way"of the victim and begged Buckhanon not to shoot him. According to appellant, Buckhanon told him to get out of the way. He said the victim was grabbing appellant's shirt, and the victim pulled appellant into the bathroom. Appellant told Detective Cox that Buckhanon ordered the victim into the bathtub and struck the victim with the butt of the shotgun. Appellant stated to Detective Cox that the victim fell into the tub, released his grasp on appellant's shirt, and attempted to escape. Appellant further stated to Detective Cox that he told Buckhanon, "[L]et's go, let's go. We got what we came for." However, Buckhanon stated that he was going to kill the victim. Appellant told Detective Cox he ran out of the house, covered his ears, and heard a shot. Appellant ran toward College Hill School, took off his shirt, and hid in some bushes. He stated that Buckhanon found him and told him that he "better not tell anybody what happened." Appellant told Detective Cox that he and Buckhanon then got into the vehicle. Appellant further told Detective Cox that Thompson was driving the car and knew what was going to happen. Appellant advised Buckhanon to "get rid of the shotgun," but Buckhanon refused. Appellant asked Thompson to let him out of the vehicle. Thompson pulled over to let appellant out, but Buckhanon pulled a shotgun on her and made her continue driving to the Woodland Trailer Park.

Detective Cox testified that appellant told him that he had also told Smith what happened. Detective Cox said he never interviewed Buckhanon. However, police arrested Buckhanon a couple of weeks later.

On cross-examination, Detective Cox testified that he could tell that appellant "[w]anted to come clean" when he interviewed him. Appellant did not tell Detective Cox where he got the information that the victim had money and drugs. Detective Cox said to his knowledge, appellant had not been at the victim's home the evening before the shooting. He said Buckhanon had been at the victim's house for "a little while" the evening before the shooting. He said appellant did not say Thompson was driving the vehicle until the second interview. Through his investigation, Detective Cox learned that Thompson was also at the victim's home the evening before the shooting.

Detective Cox stated that based on his interview with appellant, he did not believe appellant and Buckhanon discussed going inside the victim's home. He said appellant's statement caused his office to try to seek out the other offender, Buckhanon, and to try to determine the facts surrounding the incident. Detective Cox testified that through his investigation, he learned that Buckhanon might have gone into the victim's home because he and the victim "had a little feud." He said the feud supposedly began when the victim and Buckhanon were incarcerated together. Detective Cox further said he believed that appellant wanted "to get a quick lick, not get anything further than that," and did not plan to kill the victim. Detective Cox stated that appellant advised him that the victim was sitting outside

-10-

on the porch and that was where the robbery occurred. To his knowledge, appellant and Buckhanon did not take anything from inside the home.

The victim testified that he had known appellant and appellant's family for a long time. He knew appellant through appellant's cousin, Smith. The victim further testified that he had not known Buckhanon for long before September 29, 2009. He had "seen his face around town, in the trailer park [in which they] used to kick it and stuff like that."

The victim stated he had been living in an apartment with Price and Williams on Comstock Street for approximately two weeks on September 29th. The victim said on that day, he and Price stayed at home and watched football. Later, Buckhanon, Davis, Dexter, Barnett, and "Maleak's sister" visited his home. The victim stated that Buckhanon stayed for less than an hour. The victim testified that he got into an argument with Davis because Price had the victim's name tattooed on her right wrist. The victim said he did not "really say [anything] to [Buckhanon] because [Buckhanon] didn't have [anything] to say to him[.]" The victim denied that any "bad blood" existed between him and Buckhanon.

The victim testified that he had been "rolling blunts [and] smoking blunts" and had taken a couple of Xanax tablets on September 28th. He denied smoking methamphetamine and crack that day. The victim stated that during the early morning hours of September 29th he was drinking premixed gin. He said the drink was "Red Dragon," and it had a red color. The victim stated he did not vomit the drink in any part of his home, and the red substance that officers found in his home was his blood. The victim said the only money and drugs in his possession were $101, marijuana, and couple of Xanax pills. The victim stated that the $101 he had was in the pocket of red and black shorts that were on his bedroom floor.

The victim testified that in the early morning hours of September 29, 2009, he was lying on the bed in his room and heard the door open. He rolled over, looked up, and saw appellant and Buckhanon. He said he also saw Demontrae Smith run out the door. The victim denied he was on the front porch when appellant and Buckhanon initially approached him. The victim "knew something was funny" when the men entered his room, and he grabbed his telephone to call his brother. Appellant snatched the telephone from the victim. The victim asked appellant to return his telephone, and Buckhanon said, "[S]et it out, today's your day." The victim said he looked at the men, reached down to put on his pants, and looked up at the men again. When he looked up the second time, Buckhanon shot him on the right side of his face with a sawed off shotgun. He said appellant was standing behind Buckhanon when Buckhanon shot him. Because Buckhanon shot him, the victim lost some of his teeth in the bedroom.

The victim went into the bathroom and slammed the door behind him. He heard someone kicking at the bathroom door while he was in there. The victim said his skin was

-11-

hanging from his face, and he tried to "fix it" in the mirror. He stated that he was in shock and passed out. When he regained consciousness, he was upside-down in the tub, and appellant was holding up his legs, which were hanging outside the tub. Buckhanon again pointed the gun at the victim and shot him.

The victim testified that after being shot the second time, he passed out and did not recall regaining consciousness until he was in the hospital. The victim stated that he was completely blind as a result of being shot in the face twice. He said his sight could never be restored because a shotgun pellet damaged his retina. He said the shooting caused some of his teeth to come out, and he no longer had all of his teeth. He recalled speaking with Detective Cox about this case while at the hospital.

On cross-examination, the victim testified that he began drinking around 2:00 p.m. on September 28th. He said he only drank one bottle of the premixed gin. He estimated that he and his friends had smoked approximately ten "blunts" that day. The victim said he took two Xanax tablets during the evening of September 28th. He admitted he was intoxicated but said he remembered what went on that day.

The victim denied calling Buckhanon a "crab." He said he did not call Buckhanon a "crab" because he and Buckhanon "didn't get into it." He said the argument was between him and Davis, and Buckhanon was not involved. The victim stated "crab" was a term used to insult members of the Crips gang. The victim did not recall Thompson being at his home. The victim said that after the argument, he stayed inside while everyone left and denied digging in the bushes looking for something.

The victim testified that appellant and Buckhanon were "all up on" him before Buckhanon shot him, and he could not move. He said Buckhanon only said, "[T]oday's your day, set it out," before shooting him. He further said Buckhanon shot him twice, once in the bedroom and once in the bathroom. The victim testified that he knew he was lying in the bathtub when Buckhanon shot him the second time because he remembered looking up at appellant and Buckhanon. The victim stated that Smith had run out the apartment before Buckhanon shot him. He further stated that Smith did not say anything before leaving. The victim did not recall hearing any conversation between Buckhanon and appellant. He just remembered a "big boom" in his ear and feeling like his whole body was on fire.

The victim stated he never had any problems with appellant before the incident, but appellant and his friend had previously "got[ten] into it." The victim thought he was related to appellant when his friend and appellant had their altercation, and he tried to help resolve it. The victim did not discover that appellant was not related to him until after this incident.

-12-

The State rested its case-in-chief after the victim's testimony. Appellant waived his right to testify. After deliberating, the jury was unable to reach a unanimous verdict on count one, attempted premeditated murder, and the trial court declared a mistrial as to that count. The jury found appellant guilty as charged on count two, especially aggravated burglary, and count three, especially aggravated robbery. The jury assessed fines of $25,000 for especially aggravated burglary and $50,000 for especially aggravated robbery. The trial court sentenced appellant to ten years for especially aggravated burglary to be served concurrently with a twenty-one-year sentence for especially aggravated robbery. This appeal followed.

## II. Analysis

On appeal, appellant argues that the evidence was insufficient to support his convictions. Specifically, appellant argues that the evidence was insufficient to support his conviction for especially aggravated robbery because "the victim's serious bodily injury did not precede or occur contemporaneously with the aggravated robbery." Appellant also contends that the evidence was insufficient to support his conviction of especially aggravated burglary because in his statement to Detective Cox, appellant stated the robbery occurred outside of the residence while the victim was on his porch. Further, appellant argues that pursuant to Tennessee Code Annotated section 39-14-404(d), he cannot stand convicted of both especially aggravated robbery and especially aggravated burglary. The State responds that the evidence was sufficient to support the convictions and agrees that this court should modify appellant's conviction for especially aggravated burglary to aggravated burglary.

## A. Standard of Review

The standard for appellate review of a claim of insufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e); *see State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the

weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729; *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

## B. Sufficiency of the Evidence

### 1. Especially Aggravated Robbery

To sustain the conviction for especially aggravated robbery, the State had to prove that appellant committed a robbery with a deadly weapon and that the victim suffered serious bodily injury. Tenn. Code Ann. § 39-13-403(a) (2006). Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear. Tenn. Code Ann. § 39-13-401 (a) (2006). "Serious bodily injury" is bodily injury that involves substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, or the protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty. Tenn. Code Ann. § 39-11-106(a)(34) (2006).

Appellant argues that his conviction for especially aggravated robbery cannot stand "[b]ecause the victim's serious bodily injury did not precede or occur contemporaneously with the aggravated robbery." In support, appellant cites our supreme court's holding in *State v. Owens*, 20 S.W.3d 634, 641 (Tenn. 2000), that "that the use of violence or fear must precede or be contemporaneous with the taking of property from the person to constitute the offense of robbery under Tenn. Code Ann. § 39-13-401." However, appellant's reliance on *Owens* is misguided. The court in *Owens* addressed "how closely connected in time must the taking and the *violence* [or *fear*] be" in order for a theft to constitute a robbery. *Owens*, 20 S.W.3d at 637 (emphasis added). The holding in *Owens* did not state that the *bodily injury* suffered by the victim must be contemporaneous with the taking of property, only that the *use of violence or fear* must precede or be contemporaneous with the taking of property.

-14-

Turning to appellant's argument that his conviction cannot stand because the evidence was insufficient, we conclude that the evidence was sufficient to support the conviction. Appellant's version of events suggested that appellant and Buckhanon robbed the victim outside, and Buckhanon went into the victim's home and shot him. The victim, on the other hand, testified that appellant and Buckhanon entered his home and went into his bedroom. As the victim attempted to call his brother, appellant snatched the phone from his hands. Next, Buckhanon told the victim to "set it out." The victim stated that as he was attempting to put on his pants, Buckhanon shot him in his face. The victim testified that the money that appellant and Buckhanon stole from him during the robbery was in the pocket of his shorts, which were on the floor.

Appellant asserts that the testimony of Williams and the physical evidence contradicted the victim's version of events. The jury heard the witnesses' testimony regarding the events, reviewed the evidence, and saw photographs of the crime scene. By their guilty verdict, the jury clearly accredited the testimony of the victim and resolved all conflicts in the testimony in favor of the State. *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). We will not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). The evidence showed that the robbery was "[a]ccomplished with a deadly weapon; and . . . the victim suffer[ed] serious bodily injury." Tenn. Code Ann. § 39-13-403(a) (2006). Accordingly, we conclude that the evidence was sufficient to support appellant's conviction for especially aggravated robbery.

## 2. Especially Aggravated Burglary Conviction

Initially, we note that the jury convicted appellant of especially aggravated robbery and especially aggravated burglary. As appellant correctly notes, Tennessee Code Annotated section 39-14-404(d) precludes using the same acts to prosecute for especially aggravated burglary and another offense. The statute provides that "[a]cts which constitute an offense under this section may be prosecuted under this section or any other applicable section, but not both." Tenn. Code Ann. § 39-14-404(d) (2006). Here, the State used the serious bodily injury to the victim to prosecute and convict appellant of both especially aggravated robbery and especially aggravated burglary. When such a conviction has occurred, the proper action is to modify the sentence for especially aggravated burglary to aggravated burglary as a lesser-included offense. *See State v. Holland*, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993); *State v. Oller*, 851 S.W.2d 841, 843 (Tenn. Crim. App. 1992). Thus, the statute compels this court to modify the especially aggravated burglary conviction to one of aggravated burglary. *See State v. Michael Dean Marlin*, No. M2011-00125-CCA-R3-CD, 2011 WL 5825778, at *14 (Tenn. Crim. App. Nov. 17, 2011) (holding that the "effect of subsection (d) is that the Defendant cannot be convicted of especially aggravated burglary and aggravated robbery when the serious bodily injury of [the victim] was an element of both offenses"); *State v. James Ruben Conyers*, No. M002-01007-CCA-R3-CD, 2003 WL 22068098, at *8 (Tenn.

Crim. App. Sept. 5, 2003) (recognizing that appellant's convictions for especially aggravated robbery and especially aggravated burglary were plain error and modifying the appellant's conviction for especially aggravated burglary to aggravated burglary).

We now address whether the evidence was sufficient to sustain a conviction for aggravated burglary. "[A] person commits burglary who, without the effective consent of the property owner . . . [e]nters a building and commits or attempts to commit a felony, theft or assault[.]" Tenn. Code Ann. § 39-14-402(a)(3) (2006). "Aggravated burglary is burglary of a habitation." Tenn. Code Ann. § 39-14-403 (2006). A habitation is "any structure, including buildings, module units, mobile homes, trailers, and tents, which is designed or adapted for the overnight accommodation of persons[.]" Tenn. Code Ann. § 39-14-401 (2006).

Appellant challenges the sufficiency of the convicting evidence for his aggravated burglary conviction based on his version of the incident as conveyed to Detective Cox. According to appellant, the victim was outside on his porch when the robbery occurred, thus no felony occurred inside the habitation to support the aggravated burglary conviction. Appellant argues that we should discredit the victim's testimony because he was under the influence of several substances and was as "high as a bird could be." However, viewed in the light most favorable to the State, the evidence showed that appellant and Buckhanon entered the victim's residence, without the victim's consent, to rob him. The victim testified that he remembered the events of the robbery and testified consistently about what occurred. The victim said Buckhanon shot him in his bedroom causing him to lose some of his teeth. Detectives found the victim's teeth in the bedroom. The victim testified that Buckhanon also shot him in the bathroom while appellant held his legs. The detectives found evidence of a shotgun blast in the bathroom. In addition, detectives also found a shotgun shell in the front doorway of the residence. Moreover, the victim testified that the money stolen in the robbery was in the pocket of his shorts that were on his bedroom floor. The jury heard both the victim's and appellant's versions of events before convicting appellant. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *Grace*, 493 S.W.2d at 476. Again, the jury clearly accredited the victim's version of events as was within their province to do so, and this court will not re-weigh or re-evaluate the evidence. *Matthews*, 805 S.W.2d at 779. Accordingly, we conclude that the evidence was sufficient to support appellant's conviction for aggravated burglary.

## C. Modification of Sentence

Having modified appellant's conviction for especially aggravated burglary to aggravated burglary, we must also modify his sentence. The trial court sentenced appellant to ten years for especially aggravated burglary, a Class B felony. The sentence range for a

Range I standard offender convicted of a Class B felony is eight to twelve years.  *See* Tenn. Code Ann. § 40-35-112(a)(2) (2006).  Thus, the trial court sentenced appellant at the exact midpoint of the range.

Appellant's modified conviction of aggravated burglary is a Class C felony.  The sentence range for a Range I standard offender convicted of a Class C felony is three to six years.  *Id.* § 40-35-112(a)(3).  The transcript of the sentencing hearing reflects that the trial court found four enhancement factors and one mitigating factor when sentencing appellant.  The transcript also reflects that the trial court applied "60 percent of the range" to appellant's sentence, rounded down in appellant's favor.  Using the trial court's previous sentencing determination as guidance, we reduce appellant's sentence for the modified aggravated burglary conviction to 4.5 years, concurrent with the sentence for especially aggravated robbery, for an effective sentence of twenty-one years incarceration.  We also modify the fine from $25,000 to $10,000. *See State v. Daniel O'Sicky*, No. E2010-02439-CCA-R3-CD, 2011 WL 3371486, at *7 (Tenn. Crim. App. Aug. 5, 2011) ("Accordingly, we impose a sentence of six years for the modified conviction because the trial court imposed the maximum sentence for each of the Defendant's other convictions."); *State v. Jonathan Lee Adams*, No. E2008-00400-CCA-R3-CD, 2009 WL 2176577, at *9 (Tenn. Crim. App. July 22, 2009) ("Given that the trial court imposed a minimum sentence of eight years for the defendant's especially aggravated burglary conviction, on remand we instruct the trial court to enter a three-year sentence for the defendant's aggravated burglary conviction."); *State v. Larry Darnell Pinex*,  No. M2007-01211-CCA-R3-CD, 2008 WL 4853077, at *17 (Tenn. Crim. App. May 11, 2009) (imposing a modified mid-range sentence consistent with the trial court's other sentences).  Accordingly, we remand for modification of the judgment form to reflect a judgment and sentence of 4.5 years for aggravated burglary on count two.

## CONCLUSION

Based on the foregoing, we affirm appellant's conviction for especially aggravated robbery.  However, we remand appellant's conviction for especially aggravated burglary to the trial court for the amendment of the judgment of conviction to reflect this court's modification of the conviction to aggravated burglary.  The amended judgment should also reflect the reduction in the sentence on that conviction to 4.5 years and the reduction in the fine to $10,000.

_____
ROGER A. PAGE, JUDGE

-17-